International & Great Northern Railway Company v. The State of Texas.

No. 6874.

1. **Appeal in Quo Warranto Proceedings.** — The statute (Sayles' Texas Civil Statutes, art. 4098i, sec. 4) regulating appeals from judgments rendered in proceedings on information in the nature of quo warranto provides that "all such appeals shall be prosecuted to the term of the court in session, at either branch, or to the first term to be held, if not in session, after judgment has been rendered in the District Court," and

it has been held, in accordance with this and other provisions of the statute showing a legislative intention that such cases should be speedily disposed of, that there must be a substantial compliance with the statute.

2. **Same.**—Judgment in such case was rendered June 21, 1888, the Supreme Court then being in session at Austin, the record being filed to the Austin Term, 1889—the Tyler and Galveston terms intervening. The appeal must be dismissed.

3. **Same—Statute Construed.** — If the State should attempt to do something through this proceeding not contemplated by the statute (July 9, 1879, Sayles' Texas Civil Statutes, art. 4098), then its provisions regulating appeals as to such a matter can have no application.

4. **Same.**—That part of the statute which declares that an information may be filed and heard " in case   ∗   ∗   ∗   any incorporation does or omits any act which amounts to a surrender or a forfeiture of its rights and privileges as a corporation," authorized the proceeding so far as it was sought to declare a forfeiture of the charter of the defendant, but it did not authorize that part of the proceedings in which a decree was sought declaring that the exemption of its property from taxation was forfeited. To this part of the action, therefore, the rule prescribed for a speedy hearing on appeal does not apply.

5. **Same—Rights and Privileges.**—The _rights and privileges_ contemplated in section 1 of Act of July 9, 1879, are such as result from the fact of incorporation—the right and privilege to be a corporation, and to exercise the powers necessary to the consummation of the purposes for which corporate existence is given—_rights and priv- ileges as a corporation_, and not such rights and privileges in relation to property as may be vested in a corporation or an individual by contract or legislation.

6. **Same.**—The exemption from taxation in the Act of March 10, 1875, granted the defendant, is not embraced in the terms _rights and privileges of a corporation._

7. **Same—Exemption from Taxation.**—The clause in said Act of July 9, 1879, authorizing proceedings, etc., "in case any person shall usurp, or unlawfully hold or execute, or is now intruded into, or now unlawfully holds or executes any office or franchise, or any office in any corporation created by authority of this State," does not apply to the exemption from taxation enjoyed by the defendant.

8. **Same.**—If the _exemption from taxation_ could be termed a corporate franchise, we do not see how it could be withdrawn until the time for which it was given expires, so long as the existence of the corporation continues, in absence of a statute authorizing a partial forfeiture.

9. **Motives to Legislation.**—Courts can not weigh the inducements leading to a compromise act of legislation. The legislation upon this subject concludes the matter.

10. **Cases Adhered to.**—Railway Company v. Anderson County, 59 Texas, 654; Railway Company v. Smith County, 65 Texas, 21, adhered to.

11. **International and Great Northern Railway Exemption.**—By the terms of settlement between the State and the defendant, Act of March 10, 1875, the exemption from taxation is a right inhering in the property to which it applies, and follows it into the hands of whomsoever may become its owner.

12. **Same.**—The exemption would attach to the property though the defendant corporation should be dissolved by a decree declaring the forfeiture of its charter.

13. **Same.**—The right to exemption from taxation under said act is secured by the same guaranty which secures titles to those owning lands granted under the act.

14. **Same—Dissolution of Corporation.**—Lawful dissolution of a corporation will destroy all its corporate franchises or privileges vested by the act of incorporation, but if it holds rights, privileges, or franchises having the nature of property, secured by contract based on a valuable consideration, these will survive the dissolution of the corporation for the benefit of those who may have right to or just claim upon its assets.

APPEAL from Travis. Tried below before Hon. John C. Townes. The opinion states the case.

The Attorney-General filed a motion to dismiss the appeal, as follows (filed April 3, 1889):

"Now comes the State of Texas by attorney and moves the court to dismiss this case, which is by quo warranto, for the following reasons, to-wit:

"1. That the appeal herein was not prosecuted within the time prescribed by law, as the judgment in the case was rendered on June 21, 1888, and the transcript of the proceedings in the court below was filed in this court the 3d of April, 1889, three days after the first of the term.

"2. That the appeal was not prosecuted to the term of the Supreme Court in session (at Austin) at the time the case was tried, nor to the first or second terms thereafter, held respectively at Tyler and Galveston.

"3. That the copy of appellant's brief was not filed in the District Court ten days before the trial day of the term of this court, it being a case having precedence without reference to assignment."

April 23, counsel for appellant, *Baker, Botts & Baker* and *S. R. Fisher,* filed an answer resisting the motion, as follows:

"In answer to the motion of appellee to dismiss the appeal in this case, the appellant says the motion sets forth the facts as to the date of the judgment and the filing of the transcript in this court, but ought not to avail, because this suit was brought by quo warranto for two purposes:

"1. To forfeit the appellant's charter to be a corporation.

"2. To forfeit appellant's right to exemption from taxation, which was not one of appellant's franchises by its charter, but was a property right founded in contract between the State and appellant on a valid and valuable consideration, in this, that by appellant's original charter of August 5, 1870 (Special Laws), the State promised appellant ten thousand dollars per mile of its completed road in the State's bonds. This was a valid contract. 1 Desty on Am. Law of Taxation, p. 157; Mora. on Corp., sec. 1045; Cool. on Const. Lim., p. 280, and cases cited; Railway v. Reid, 13 Wall., 266.

"That afterwards, and after appellant had completed two hundred miles of its road to the State's satisfaction, questions arose between the State and appellant as to the legal liability of the State to deliver its bonds; and on the 10th of March, 1875, those questions were compromised and settled between appellant and the State by the State granting to appellant lands and exempting appellant's corporate property from taxation for a time which has not yet expired; and in the Act of March 10, 1875 (Spec. Laws, p. 69), that compromise and settlement were declared to be an irrepealable contract, and the lands and exemptions were declared to be

in full settlement and satisfaction of appellant's claim for bonds.   The settlement was accepted by appellant and the contract was executed in good faith by the State, and constituted a valid contract between the parties founded on a valuable consideration.   Railway v. Anderson County, 59 Texas, 654; 1 Add. on Con., 8 ed., p. 11; Crans v. Hunter, 28 N. Y., 389; Hembig v. Ramsay, 46 Pa. St., 252; Allen v. Prather, 30 Ala., 458; McKinney v. Watkins, 13 Ill., 140; Railway v. Mosely, 52 Miss., 127.

"This exemption from taxation was not a *franchise* of appellant, but was and is an immunity from taxation.   Morgan v. Louisiana, 93 U. S., 217; Railway v. Miller, 114 U. S., 176; Tomlinson v. Jessup, 15 Wall., 458; Railway v. Reid, 13 Wall., 264.

"So that applicant's exemption from taxation is not one of the franchises which the State can forfeit as long as appellant retains its corporate existence, but is an immunity purchased by it for a valuable consideration; and the immunity became and is a vested property right which is protected by the Constitution of this State (art. 1, secs. 16, 17), and by the Constitution of the United States (art. 1, sec. 10), and can not be affected by quo warranto.

"The court below refused to forfeit appellant's charter, and appellant had no cause for appealing under the statute of 1879 on that account, for the reason that the judgment below did not affect its franchise or any of its officers.   But inasmuch as the judgment below destroys a property right of appellant, because the court supposed the right was only a franchise, appellant may appeal, or have its writ of error to correct so much of said judgment as destroys that right, as in any other civil case.

"If the appeal had been returned to this court while in session, or to the term at Tyler, which was the next held after the judgment below was rendered, then on a motion to dismiss, because the judgment below does not affect any franchise or office, but only a property right, this court would certainly have dismissed the appeal on the ground that it did not come within the Act of 1879 regulating appeals in cases affecting offices or franchises."

*J. S. Hogg*, Attorney-General, on motion to dismiss appeal. — 1.   On a motion to dismiss the court should not consider the merits of the case. De Leon v. Clark, 3 Texas, 153.

2.   The State's only form of action to forfeit any right claimed by a corporation is by information in the nature of a quo warranto.   Acts of 1879, p. 43.

3.   Exemption from taxation, though it may arise out of contract, the obligations of which when resting on a consideration can not be impaired or repealed by legislative act, is nevertheless a *franchise* or *right* subject to forfeiture for conditions broken.   Fountaine v. State, 69 Texas, 510; Livingston v. The State, 70 Texas, 393; Attorney-General v. Ins. Co., 15

Johns., 358; 98 U. S., 365; Attorney-General v. Railway, 29 Am. and Eng. Ry. Cases, 440.

The motion to dismiss was overruled. No written opinion was delivered.

*Baker, Botts & Baker* and *S. R. Fisher*, for appellant. — 1. Section 9 of the charter of the International Railroad was a contract between the State and said company, to the effect that, in consideration that the company would build its road as chartered, and within the time mentioned, the State, as an inducement to do so, would donate her bonds to said company to the extent of ten thousand dollars for each mile of road constructed under its charter. But the State refused to comply after the company entered on the work.

Said section 9 is as follows: "Section 9. In order to secure and promote the rapid construction of said railway, and thereby afford cheap and necessary facilities for immigration into the State, as well as speedy communication between the northeastern and southwestern boundaries, and with the eastern and northern States, and to meet as soon as practicable the wants of the people of the State in promoting the settlement of the vacant lands and the development of its resources, the State consents, binds, and obligates itself to donate, and hereby grants to said company the bonds of the State of Texas to the extent of ten thousand dollars per mile for each mile of said road constructed under this charter." 1 Desty on Am. Law of Tax., 157; Mora. on Corp., sec. 1045; Scotland County v. Railway, 65 Mo., 123; Cool. on Con. Lim., 4 ed., p. 280, and cases cited in note 2; Railway v. Reid, 13 Wall., 266; Bledsoe v. Railway, 40 Texas, 537.

2. The exemption of the International and its property from taxation under the Act of March 10, 1875, was not a franchise which can be forfeited by the State during the existence of the International charter, but was and is an immunity from taxation, and part of the consideration which the State paid the company after it had built 200 miles of its road, in compromise and settlement of what the State admitted to be a question between her and the company as to the legal liability of the State to deliver her bonds as promised in the International charter, and as then claimed by the company; and the settlement of that question was a valid consideration for the immunity, and the contract has been fully executed by both parties, and the charter is still in force. 1 Add. on Con., 8 ed., p. 11; Crans v. Hunter, 28 N. Y., 389; Heming v. Ramsay, 46 Pa. St., 252; Allen v. Prather, 30 Ala., 458; McKinley v. Watkins, 13 Ill., 140; Railway v. Mosely, 52 Miss., 127; Morgan v. Louisiana, 93 U. S., 217; Railway v. Miller, 114 U. S., 176; Tomlinson v. Jessup, 15

Wall., 458; Jersey v. Wilson, 7 Cranch, 164; Bank v. Skelly, 1 Black, 436; Home v. Rouse, 8 Wall., 430; Railway v. Reed, 13 Wall., 264.

3. Not only the facts before referred to make the settlement under the Act of March 10, 1875, a valid contract between the State and the company, founded on a valuably consideration, but the State so regarded it, and declared the act should "be held to constitute an irrepealable contract and agreement between the State and said company, its successors, and assigns," and this is so recognized by this court. Railway v. Anderson County, 59 Texas, 654; Railway v. Smith County, 65 Texas, 21; Cool. on Tax., 52–56; Humphrey v. Pegues, 16 Wall., 249; Tomlinson v. Branch, 15 Wall., 460.

4. Granting the lands under said act from Longview to Austin was an admission by the State that the company had accepted the Act of March 10, 1875, and thus said act became an executed contract for a valuable consideration, and the immunity from taxation thereby became a property right of the company and its assigns, of which the State can not deprive it during the existence of its charter without adequate compensation, under section 16 of the Bill of Rights; nor can the courts do so without violating section 10 of article 1 of the Constitution of the United States; and the court had no power to adjudge the forfeiture in this case, and its action is in violation of section 16 of the Bill of Rights of this State, and in violation of section 10 of article 1 of the Constitution of the United States. 1 Desty on Tax., p. 157; Scotland County v. Railway, 65 Mo., 123; Cool. on Const. Lim., mar. p. 280; Mora. on Corp., sec. 1045; Railway v. Reid, 13 Wall., 264; Home of the Friendless v. Rouse, 8 Id., 430; Bank v. Skelly, 1 Black, 436; 3 Wood on Rys., p. 1691.

*J. S. Hogg,* Attorney-General, and *R. H. Harrison,* assistant, for State.
1. The exemption from taxation granted to appellant was a franchise, subject to be forfeited, independent of or in connection with its charter, and the information in the nature of a quo warranto was the proper remedy therefor.

The original consideration, by Act of 1870, to be paid by the State to respondent was severable; consisting, first, of bonds—personal property (sec. 9); second, immunity from taxation for a period of five years as to corporate property (sec. 12).

The consideration by the Act of 1875 was a substitute for the original one and was also severable, as it consisted, first, of real estate and its exemption from taxation (sec. 1); second, an extension of the immunity from taxation as to corporate property from five to twenty-five years (sec. 1).

The property consideration that the State was to pay either in bonds or real estate became due at stated periods as the building of the road

progressed, and when received vested title in and was capable of assignment by the company. They were tangible effects, subject to transfer at the will of the corporation on the title being conveyed to it by the State. In the Act of 1870 there were three classes of franchises, privileges, and rights granted to the corporation by the State: First—Those that were necessary and incidental to the construction, operating, and maintenance of the railway (sec. 2). Second—Those that were necessary to construct, operate, and maintain ferries across the rivers along its line (sec. 3). Third—The right and privilege of immunity from taxation (sec. 12).

The Act of 1875 only repealed such parts of the Act of 1870 as were in conflict with it. By that act the company had granted to it the enjoyment of its ordinary corporate franchises, and was further given the following immunities, privileges, and franchises: First—A franchise to own, maintain, and operate a railway. Second—The extension of the immunity from taxation from five to twenty-five years on all of its corporate property. Sec. 1.

The tax exemption of 1870 was continuous, personal, and conditional, to cover a period of five years, if the railroad company should build under its charter. This limitation had not expired, nor is it contended that the conditions upon which the immunity depended under that act had been broken when the Act of 1875, extending it, was passed. The latter act did not seek to deprive the company of the immunity that it was then enjoying upon the two hundred miles of railway that it had already built, but extended it for a period of twenty-five years upon all the property that the railway company or its successors owned or possessed. This latter extension was as continuous, personal, and conditional as was the former. It was conditional, first, upon the ownership and operation by the company or its successors of the road then in existence; second, that the company or its successors should thereafter construct, own, and operate the railway pursuant to the Act of 1870, and to the said Act of 1875. It was continuous, so long as the property in question should be operated for railway purposes by the company or its successors. It was personal to that company and its successors, because there was no right of assignment given to the company or its successors to the property upon which the exemption was placed. Therefore, if the company at the time the Act of 1875 was passed, did not own in fact any property, then the immunity did not take effect. If it should thereafter have failed to build a railroad, then the condition as to that could not have taken effect. If the company or its successors failed, though it owned the railway property, to operate and maintain it, then the exemption was lost on that ground. If the company or its successors, after constructing, owning, and operating the road, thereby enjoying the continuous exemption during the period of said owership, and it subsequently parted with the title to the property or the possession of it, then upon the condition broken the right of tax-

ation was lost.  As the immunity from taxation under the Act of 1870 was conditional, dependent upon performance by the railway company, it was also conditional under the Act of 1875.  The two acts, if deemed to be constitutional, must be construed together and made to harmonize, and be upheld in so far as they do not conflict in purpose or effect.  The leading purpose was the construction of a railway—an international route—through the State from one border to the other.  This was one of the conditions upon which the immunity from taxation in the first instance was granted, and it was only continued by the Act of 1875.

"Franchises contain an implied covenant on the part of the government not to invade the rights vested, and on the part of the grantees to execute the conditions and duties prescribed in the grant.  The obligation between the government and the owner of such franchises is mutual. It is obliged to provide and maintain facilities for accommodating the public at all times with prompt and convenient passage."  3 Kent Com., 590.  As said by Mr. High in his work on Extraordinary Legal Remedies, section 651, "The non-performance of the conditions of the act of incorporation is prima facie a misuser sufficient to forfeit the grant on proceedings by information; and in determining whether such a departure from the provisions of the act of incorporation has been made as to work a forfeiture, the same general principles of construction are applicable which govern valuable grants to individuals upon conditions subsequent or precedent."

Is the tax exemption such a grant as can be forfeited upon a breach of the condition on which it depended?

This leads to a discussion  First: Is this immunity a franchise? Second: If so, can it be forfeited by quo warranto proceedings?

"Franchises are royal privileges in the hands of the subject."  2 Blacks. Com., 37; Finch's Law, 164.  "A particular privilege conferred by grant from the sovereign or the government and vested in individuals; an immunity or exemption from ordinary jurisdiction; the limits of an immunity."  Webster's Dic.; 3 Kent's Com., 458.

"Immunity" means freedom from an obligation; exemption from any charge, duty, office, tax, or imposition; a particular privilege.  Webster's Dic.

"Privilege.  An ordinance or law against or in favor of an individual; a peculiar benefit or advantage; a right or immunity not enjoyed by others or by all; special enjoyment of a good or exemption from an evil or burden; prerogative; advantage.  To grant some particular right or exemption to; to invest with a peculiar right or immunity; to exempt.  It is used synonymously with prerogative, immunity, franchise, right, claim, liberty."  Webster's Dic.

"Franchises are special privileges conferred by government upon individuals, and which do not belong to the citizens of the country generally

of common right." Bank v. Earle, 13 Pet., 595. "They have various significations. A corporation itself is a franchise, belonging to its members, and it may possess other franchises. It is made up and consists of its rights and franchises."

A tax exemption is a franchise. Attorney-General v. Railway, 29 Am. and Eng. Ry. Cases, 440; 15 Johns, 358.

The case of Morgan v. Louisiana, 93 United States, cited by the respondent to show that an immunity from taxation is not a franchise, will not support the proposition. It simply holds in effect that immunity from taxation is not one of the franchises essential to the operation of a corporation. In the later case of Railway v. Georgia, 98 United States, 259, the court says: "It is quite too narrow a definition of the word franchise to hold it as meaning only the right to be a corporation. The word is generic, covering all rights granted by the Legislature," and it holds in effect that a tax exemption is a franchise.

It is wholly unimportant as to whether this immunity from taxation shall be termed a "franchise," "privilege," or a "right," for it is one that can not be enjoyed by either an individual or a corporation without express grant of the government. It is certainly not such a privilege, franchise, or right as affects the life of the corporation, nor is it one required in the operation of the road. The right of taxation is one of the prerogatives of government, upon the exercise of which its life depends. By it revenue is raised; without it the government could not operate. The basis of all taxation is political necessity. Without taxes there can be no revenue; without revenue there can be no regular government. Burr. on Tax., sec. 2. Then certainly when the Legislature granted to respondent immunity from taxation for twenty-five years, it parted to that extent with one of the most material and important governmental prerogatives. It was a franchise, a right, a prerogative—a privilege, forsooth. The State therefore contends that the proceeding herein pursued is the proper one.

The ancient writ of quo warranto was a high prerogative writ in the nature of a writ of right for the king against one who usurped or claimed any office, franchise, or liberty of the crown, to inquire by what authority he supported his claim, in order to determine the right. High Ex. Leg. Rem., sec. 292. An information in the nature of a quo warranto takes the place of the original writ. It lies in all cases where that writ could have been maintained. Id., 600. It is the proper remedy to oust a party from the enjoyment of certain immunities and privileges in which the public have an interest, as contradistinguished from private rights, and which can not be exercised without authority derived from the sovereign power. People v. Ins. Co., 15 Johns., 353; 55 N. Y., 529; 8 Am. Dec., 257.

The exercise of a privilege or immunity of a public nature which can

not be lawfully exercised without legislative authority is a franchise, and the remedy to forfeit it by the State is on information in the nature of a quo warranto.   State v. Bank, 5 Ark., 595; 41 Am. Dec., 112; 16 Am. Dec., 532; 36 Am. Dec., 460; 23 Wend., 193, 222, 254.

Numerous authorities on this line could be cited, but they are deemed unnecessary.   The statutes of Texas are sufficient, and provide that the Attorney-General shall, "whenever sufficient cause exists therefor, seek a judicial forfeiture of the charters of private corporations, and he shall * * * seek such forfeiture in all cases where any corporation receiving State aid has, by non-performance of its charter conditions, or the violation of its charter, or by any act or omission, misuser, or nonuser, forfeited its charter or any rights thereunder."   Rev. Stats., art. 2805.

If the court had decreed a forfeiture of the charter of respondent, then the incidental and necessary privileges created under it would have as a matter of course been annulled also.   What is meant by the term "any rights thereunder," if it does not mean some right other than the ordinary franchises granted in a railway charter?   Is not this term general enough to include the right respondent enjoyed to construct and operate ferries over the rivers along its route?   That was not one of the ordinary or necessary franchises embodied within its corporate charter, yet it was a right enjoyed thereunder.   If a quo warranto to forfeit such a right as that could be maintained, then by what logic or rule of reason could it be said that immunity from taxation is not such a right enjoyed by express grant in the charter as could also be forfeited by the same method?   The statute in providing that the charter should be forfeited never expressly included the franchises enjoyed by it, because such was not necessary.   The forfeiture of the charter means the destruction of every franchise incidental to it.   Therefore any rights thereunder must mean all those grants by the government which were not necessary corporate franchises.   Again, the statute says:   "In case any * * * corporation does or omits any act which amounts to a surrender or a forfeiture of its rights and privileges as a corporation, or exercises power not conferred by law, the Attorney-General may file information in the nature of a quo warranto to have them forfeited."   Gen. Laws, p. 43.

This tax franchise, immunity, right, or privilege (let it be called either) was certainly not enjoyed by the respondent except as a corporation.   The individual members of the company could not claim such as a right or privilege, but the corporation itself enjoyed it as a right granted under its charter, and it applied and was confined to its corporate property. Such rights and privileges were not absolutely necessary to the corporate existence, but they were rights and privileges promised by the State as conditions upon which the company as a corporation undertook and promised to build, own, maintain, and operate its railroad.   Now, then, if such a thing is possible as the forfeiture of a railway charter, then it does seem

equally so that the State could revoke an express grant, privilege, or immunity from taxation when the purpose for which it was conferred had failed, or the conditions upon which it depended had been broken.

Suppose the State had brought an ordinary civil action in this case, what would have been its purpose? To recover property? No. It could only have been to forfeit a grant—a grant of immunity from taxation. In that event a demurrer would have been pressed to such an extent as to cause the State to long for the only express remedy provided for it—an information in the nature of a quo warranto.

2. The consideration of immunity from taxation was continuous, conditional, personal; incapable of transfer without express statutory direction, and was lost upon dissolution of the corporation or the lease of its corporate property.

Under the laws of Louisiana all the property, franchises, etc., of a certain railway company were exempt from taxation. The company mortgaged its property and franchises, under which it was sold pursuant to the terms of a judicial decree. The purchaser claimed the immunity from taxation granted by the charter to the company. The Supreme Court of the United States held that by the sale only such franchises passed as were necessary to the operation of the road and without which the road and works would be of little value, and that consequently the property in the hands of the purchasers was subject to taxation. The court distinctly stated that immunity from taxation is a personal privilege and not transferable except with the consent or under the authority of the Legislature which granted the exemption or some succeeding Legislature, and that it did not necessarily attach to or run with the property after it passes from the owner in whose favor the exemption was granted. Morgan v. Louisiana, 93 U. S., 217.

Two railroad companies created under the laws of Georgia each enjoyed by its charter exemption from taxation. After their acts of incorporation a law was passed which reserved to the State the right to change, modify, or destroy the charters of private corporations and to withdraw all franchises granted to them. Subsequent to this latter act another law was passed which authorized the consolidation of said two companies and conferred upon the consolidated company the full corporate powers and conveyed to it the franchises, privileges, and immunities which the companies respectively had held. The consolidated company therefore claimed the immunity from taxation enjoyed respectively by its two predecessors, which the State denied it. The Supreme Court of the United States in deciding on the case held, first, that by the consolidation the original companies were dissolved and a new corporation was created, which became subject to the provisions of the code in force at the date of the consolidation; second, that a subsequent legislative act taxing the property of such new corporation as other property in the State was taxed

was not prohibited by that provision of the Constitution of the United States which declares that no State shall pass a law impairing the obligation of contracts. Railway v. Georgia, 98 U. S., 359.

In Railway v. Perry, 113 United States, 465, the Supreme Court of the United States held that a consolidation of two railway companies creates a new corporation, and that thereby the immunity from taxation enjoyed by one of them was lost. The court will see on examination of this case that the Cairo & Fulton Railway Company, which enjoyed the immunity from taxation by its charter in the State of Arkansas, was the sister road of the respondent, leading from Fulton on Red River northward, which respondent's original charter intended it to join. The charter of this Arkansas company provided "that the capital stock, etc., of said company shall be forever exempt from taxation." It also provided that said company should have the right to consolidate with other connecting railway companies. At the time the charter act was passed the Constitution of that State did not limit the right of the Legislature to make such grants. Afterwards and before the act of consolidation the Constitution of said State provided that the property of corporations * * * shall forever be subject to taxation the same as property of individuals. This provision was in force when that railroad in 1874, by consolidation with the St. Louis & Iron Mountain Railway Company, merged into and became what is known as the St. Louis, Iron Mountain & Southern Railway Company, which in its corporate capacity claimed the immunity from taxation enjoyed by the said Cairo & Fulton road under its original charter. On that question the Supreme Court held that by reason of said constitutional provision having passed after the original act of incorporation and before the act of consoldiation "rendered it impossible in law for the consolidated corporation to receive by transfer from the Cairo & Fulton Railway Company or otherwise the exemption sought to be enforced in this suit."

The Legislature of Virginia, by an act incorporating a railway company, provided among other things "that no taxation upon the property of said company shall be imposed by the State until the company's profits shall amount to ten per cent on the capital stock of the company." The company became consolidated by an act of the Legislature with several other railroad companies under the name of the Chesapeake & Ohio Railroad Company, and the companies so consolidated were vested by the consolidating act with all the rights, privileges, franchises, and property which may have been vested in either company prior to the act of consolidation. A judicial sale also was made of the corporate property of the company to satisfy the indebtedness incurred in its construction and equipment, which gave the purchasing company under the laws of that State "all the franchises, rights, and privileges held by the former as if such sale had not been made."

A fuller statement of the case is perhaps unnecessary here on the point at issue. But speaking of the tax exemption invoked by said Chesapeake & Ohio Railroad Company, the Supreme Court said: "It is quite clear that as a contract originally entered into * * * it was personal to that (the original) corporation and intended to benefit those who should be induced to subscribe to its stock. * * * It was not made with the creditors of the company, nor was it conferred as a franchise inhering in the property itself so as to pass by way of encumbrance or assignment to mortgagees or purchasers. * * * The one company is spoken of, and that is the company to be incorporated under the act. The property to be exempt is the property of that company and no other, and while it continues to be the property of that company and no longer. And there are no words of assignability attached, either expressly or by any implication, to this immunity." Railway v. Miller, 114 U. S., 176.

The stock, etc., of a railroad company chartered under the laws of Missouri was exempt from taxation. Subsequently an act was passed by the Legislature of that State which, among other things, provided "that if a railroad company of another State shall lease a railroad, the whole or a part of which is in this State, or make arrangements for operating the same as provided in this act, or shall extend its railroad into this State or through this State, such part of said railroad as is within this State shall be subject to taxation." Thereafter a railroad company of another State "purchased" the one that enjoyed the immunity from taxation under its original charter in Missouri. On the question as to the liability of the purchasing company to taxation, counsel for it placed great stress upon the fact that it had not "leased" the property, and was therefore not subject to the conditions of the act. The Supreme Court held otherwise in support of the Supreme Court of Missouri. Railway v. Guffey, 122 U. S., 561.

The International Railway Company, the respondent, by section 14 of its original charter, was authorized to consolidate with any other connecting railway company. It was not authorized, however, to lease its road. Instead of consolidating, it did lease the corporate property for a period of ninety-nine years, a term beyond its own lawful existence. Had it exercised the express power conferred on it. by law, by an act of consolidation, then on principle and according to the foregoing decisions it would have lost its exemption from taxation. How it is possible then for it to do an illegal act amounting to self-destruction and thereby retain immunities which it could not have enjoyed by lawful control of its own property, on a consolidation with other companies, is difficult to be understood.

The court will observe that the very purpose of the lease was to evade the effect, if possible, of the foregoing decisions, which denied the right of further immunity from taxation on the property of the old company

after an act of consolidation.    They wanted this exemption to continue, for it was a valuable grant, of great advantage in more than one respect, which must be apparent to every one.    The lease therefore was made, which on analysis will be found to be equivalent to a sale; indeed, far worse than any act of consolidation possibly could have been.    An act of consolidation would have created only a partnership of the consolidated companies in the new corporation, leaving respondent in joint control of the corporate property.    The lease transferred the exclusive management and control of its property to a foreign corporation for ninety-nine years from 1881. The life of respondent began on August 5, 1870, and must have terminated at least within one hundred years under the charter.    By its act of lease it has attempted to prolong its existence to a period of one hundred and ten years from the date of its inception.    It enjoyed its immunity from taxation without disturbance up to June, 1881, over the road that it had constructed from Longview, in the east, across the State to San Antonio, in the west, a distance of 356 miles.    At that time it transferred to a foreign corporation all of its corporate property, franchises, and privileges, not only to and upon the road so constructed under its own charter, but as to all other roads that should thereafter be constructed by virtue of its charter, which included that part lying between San Antonio and Laredo, a distance of 160 miles.    This latter part it will be seen was not built until after the lease, and was constructed by the lessee under the respondent's charter—an act wholly unauthorized.    The enjoyment of the tax exemption was continuous; and as to the respondent in possession of its own road it was intended to last until the year 1900.    After it ceased to control its property and transmitted the right of construction of that portion of it from San Antonio to Laredo into the hands of its lessee, it seeks now to protect the abandoned property as well as that which it did not construct itself, last referred to, in this high privilege conferred upon it by the State.    After its lease in 1881, was it a matter of much concern to the respondent that the tax exemption should continue?   Certainly not; for in effect its right, title, and interest in all the property was relinquished forever.    Then its only purpose must be to protect the interests of its lessee.    It comes into court without property, without corporate purpose, without the right to manage, operate, or control, or have any voice whatever in the management of a railroad in Texas, with its domicile in the State of New York, and asks protection of the court as to an immunity from taxation, in behalf really of another.

An inspection of the lease will certainly convince the court of what is here said in reference to it.    That instrument was fully intended as a divestiture of title.    It was so in fact and in law.    At the end of the term, if there should be any estate left, there could be no one to take it. The charter of the Houston & Great Northern Railway Company limited its existence to a period not exceeding sixty years from 1866; that of the

Houston Tap & Brazoria limited it to a period of ninety years from 1856. These two charters respondent claimed merged into it by the special act of 1875. The general laws of this State in force at the time the lease was made limited the life of railway corporations to fifty years, and one could not be chartered for a longer period. Rev. Stats., art. 4106.

The lease could not be revoked at the will of the respondent, nor could it be upon an ordinary contingency, or one that was likely to happen at all. It granted the lessee the right to assign its whole corporate property, "with full and exclusive power, right, and authority to use, manage, and work" it, and to "have full, free, and exclusive right to collect all of the tolls on and freight charges and dues to accrue from said railroad during said term." The only obligations resting upon the lessee company, and the only payments to be made by it, were such as the law would have imposed upon it by an unconditional sale, except that which related to the maintenance of the general offices of the lessor company in New York. First, it obligated itself to work, use, maintain, and operate the railroad, and to take care of the property; and second, to pay the actual cost of repairing, maintaining, and operating it, and to keep it insured and its taxes paid; third, the payment of interest that should become due on the liability fixed upon the corporate property by mortgages; fourth, to pay any remaining surplus to the grantor, to be applied by it to the payment of interest on other bonds as should thereafter be issued.

After authorizing the lessee to advance all funds required from time to time to pay interest on bonds and other fixed charges, which under the contract should become when so advanced a preferred debt and lien next to the first mortgages on the property, the parties agreed to the following condition, which is the only one in the whole contract giving the lessor the right upon any contingency whatever to terminate the lease, to-wit: "If the lessee elects not to advance any such deficit, and the interest on the first and second mortgage bonds shall remain unpaid for a period of six months, the lessor company may thereupon elect to terminate this lease, and to receive back the property, on the payment of any balance of indebtedness then due from it to the lessee."

Under the terms of that lease none of the officers or agents of respondent could even ride over the road free of charge, except "for the purpose of ascertaining as to the business and management of said railroad, and reporting thereon" to itself.

The only condition which reserved the right of respondent to resume the control of its property, contained within it an obligation as a condition precedent to the termination of the lease which left it in the power of the lessee while operating the road to make that right impossible by incurring indebtedness which could not be paid by the lessor. Nowhere in that lease is any rental obligation imposed upon the lessee, but the clause above

referred to obligates the lessor, if it ever proposes to terminate the lease, to pay "any balance of indebtedness then due from it to the lessee;" and the conveyance is for a greater estate than the corporation itself had in the property, for it extended to a period beyond its life. It seems to be well established as a fundamental principle that a lease should be for a less estate or term than the lessor has in the property; that if it comprises its whole interest, or extends beyond the term for which the company could hold it, the conveyance is a sale, and not a lease.

The purpose of this discussion is to draw the court's attention to the terms of the so-called lease executed by respondent to the Missouri, Kansas & Texas Railway Company, and to illustrate the proposition that if respondent would have lost its immunity from taxation by an authorized act of consolidation, that it certainly would do so by a lease for a term of years beyond its own life, which amounted to a sale in law and deprived it of the control of its own corporate property, and the enjoyment of any privileges or franchises granted by the State to it.

If this position be not correct, then, as the corporation still exists, it could maintain itself for the purpose of purchasing personal property, rolling stock, etc., and for many years to come force the immunity from taxation as to that. The railroad and its appurtenances are personal property in law. If, then, a lease of it carries with it the tax exemption to the lessee, then certainly this privilege would be enjoyed by every truck, wheel, hand car, caboose, coach, and crowbar that should have ever belonged to or that may hereafter be possessed and sold or leased by respondent.

STAYTON, Chief Justice.—This proceeding was brought by the State through the Attorney-General under the act regulating proceedings in quo warranto, and the purpose of the proceeding was:

1. To have declared a forfeiture of the company's charter and wind up its business.

2. To have a decree withdrawing from the company's property the immunity from taxation given by the Act of March 10, 1875.

On hearing the court below found that the facts proved did not justify a forfeiture of the company's charter, but that the facts relied upon for that purpose were sufficiently shown to authorize a decree declaring the company's property no longer exempt from taxation.

A judgment was entered accordingly by the District Court for Travis County on June 21, 1888.

Appellant gave notice of and perfected an appeal in proper time, and both parties filed assignments of error, but the record was not filed at any branch of this court until April 3, 1889, when a motion to dismiss the appeal was filed by the State.

This court was in session at Austin when the judgment was rendered,

and on the first Monday of October following convened at Tyler, where a term was held, and then convened at Galveston, where a term was held, after which it convened at Austin again on the first Monday in April, 1889.

The ground of the State's motion to dismiss was that the appeal was not prosecuted to the term pending when the judgment was rendered, nor to the succeeding term held at Tyler.

The motion was overruled, but without any written opinion, and the State now seeks a revision of so much of the action of the court below as refused to forfeit the charter of the company, and to sustain the other part of the judgment.

The statute regulating appeals from judgments rendered in proceedings on information in the nature of quo warranto provides that "all such appeals shall be prosecuted to the term of the court in session, at either branch, or to the first term to be held, if not in session, after judgment has been rendered in the District Court;" and it has been held, in accordance with this and other provisions of the statute showing a legislative intention that such cases should be speedily disposed of, that there must be a substantial compliance with the statute.

The act prescribes the cases in which informations under it may be prosecuted, and its other provisions must be held to apply only to such proceedings as are contemplated by it.

So much of the act as it will be necessary to consider is as follows:

"In case any person shall usurp, intrude into, or unlawfully hold or execute, or is now intruded into, or now unlawfully holds or executes any office or franchise, or any office in any corporation created by the authority of this State, or any public officer shall have done or suffered any act which by the provisions of law works a forfeiture of his office, or any association of numbers of persons shall act within this State as a corporation without being legally incorporated, or any incorporation does or omits any act which amounts to a surrender or a forfeiture of its rights and privileges as a corporation, or exercises powers not conferred by law, * * * the Attorney-General, or district or county attorney of the proper county or district, either of his own accord or at the instance of any individual relator, may present a petition," etc.

There are but two parts of this statute which can have any application to the question raised by the motion to dismiss, and to the State's right now to have revised so much of the decree as refused a forfeiture of the charter of the company.

If the State attempted to do something through this proceeding not contemplated by the statute, then its provisions regulating appeals as to such a matter can have no application; but in so far as the proceeding was contemplated by and in pursuance of the statute its provisions regulating appeals must be applied.

That part of the statute which declares that an information may be filed and heard "in case  *  *  *  any incorporation does or omits any act which amounts to a surrender or a forfeiture of its rights and privileges as a corporation," and that in case the corporation be adjudged guilty the court shall declare a forfeiture of the corporate franchise, is that on which the proceeding was based, and properly based, in so far as a forfeiture of the charter of the company was concerned; and if the State desired to appeal from the judgment in so far as adverse to it, then it should have complied substantially with the statute, and not having done so, we are of opinion that it can not now have a revision of any matter permitted by the statute to be adjudicated under the terms and restrictions therein found.

We will notice the grounds on which the motion to dismiss the appeal was overruled, for it is intimately connected with the main question involved in this appeal.

It was not believed that the statute on which the proceeding is based authorized so much of it as sought to have a decree declaring that the exemption of appellant's property given by the Act of March 10, 1875, and compliance therewith should cease to exist, and that for this reason the provisions in regard to appeals could not affect appellant's right to prosecute its appeal under the general laws applicable thereto.

It would hardly be contended if the State's officer, in a proceeding properly instituted under the statute to forfeit the charter of the company, had joined with that a proceeding to try the company's title to its lands, railway, rolling stock, and other property, that the latter would be governed by the statute in question as to time or mode of prosecuting an appeal.

To be governed by the particular statute the proceeding must be one authorized and contemplated by it, for it is only because it was thought that the best interests of all in reference to such matters would be subserved by most speedy determination of the litigation, that a different rule to that applied in other cases as to time within which appeals should be prosecuted was prescribed.

The "rights and privileges" contemplated by the clause of the statute before referred to are evidently such as result from the fact of incorporation—the right and privilege to be a corporation, and to exercise the powers necessary to the consummation of the purposes for which corporate existence is given—"rights and privileges as a corporation," and not such rights and privileges in relation to property as may be vested in a corporation or an individual by contract or legislation.    Morgan v. Louisiana, 93 U. S., 223; Railway v. Miller, 114 U. S., 185.

The character of right conferred by the Act of March 10, 1875, in so far as it exempted appellant's property from taxation for a fixed period, will be considered in another connection, and it is sufficient now to say

that it is not embraced in the term "rights and privileges as a corporation."

That part of the statute which declares that information may be filed "in case any *person* shall·usurp, intrude into, or unlawfully hold or execute, or is now intruded into, or now unlawfully holds or executes any office or franchise, or any office in any corporation created by authority of this State," is the only part not considered which, with any show of reason, could be claimed to authorize a proceeding under the statute to withdraw appellant's right to exemption from taxation; but it is too clear that this language does not apply to such a right or immunity, even though in a general sense it may be termed a franchise, and that it applies only to usurpation of or intrusion into an office, or a franchise pertaining thereto. A much more restrictive meaning has constantly been given to the statute of Anne, from which this part of the statute is taken. State v. Smith, 55 Texas, 451.

Appellant's claim to exemption from taxation is based on the act of March 10, 1875, so much of which as has application to the question before us is as follows:

" An Act for the relief of the International Railroad Company, now consolidated with the Houston & Great Northern Railroad Company, under the name of the International & Great Northern Railroad Company:

" Whereas, on the 5th day of August, A. D. 1870, the Legislature of the State of Texas passed an act entitled ' An Act to incorporate the International Railroad Company, and to provide for the aid of the State of Texas in constructing the same;' and

" Whereas, by the ninth section of said act it is claimed the State of Texas obligated itself to donate and grant to the said company the bonds of the State of Texas to the extent and amount of ten thousand dollars per mile for each mile of railroad constructed under said charter; and

" Whereas, the said railroad company has already constructed about two hundred miles of railroad, in accordance with the provisions of its charter; and

"Whereas, the said International Railroad Company has been consolidated with the Houston & Great Northern Railroad Company under the name of the International & Great Northern Railroad Company; and

" Whereas, questions have arisen between the State of Texas and the said company as to the legal liability of the State to deliver said bonds to the said company; and

" Whereas, it is important both to the State and said company that these questions should be definitely settled by a just and reasonable compromise; therefore, for that purpose,

"Section 1. Be it enacted by the Legislature of the State of Texas, That in full settlement and satisfaction of all claims of the said The International Railroad Company and of the said The International & Great

Northern Railroad Company against the State for bonds under the provisions of the 9th section of the aforesaid Act of August 5, A. D. 1870, there is hereby granted to the said last named company, its successors and assigns, twenty sections, of six hundred and forty acres each, of the unappropriated public lands of the State for each mile of railroad which has been and which may hereafter be constructed pursuant to the authority conferred by the said Act of August 5, A. D. 1870. And the said company, its successors and assigns, shall have the right to locate the said lands as headright certificates were formerly located, without being under obligation to locate alternate sections for the State; and the said lands and the certificates issued therefor are hereby exempted and released from all State, county, town, city, municipal, and other taxes for the period of twenty-five years from the date of the respective certificates issued therefor. And the said railroad company and its successors, and its and their capital stock, rights, franchises, railroads constructed and to be constructed, pursuant to the said Act of August 5, A. D. 1870, and this act, rolling stock, and all other property which now is or hereafter may be owned or possessed by said company or its successors in virtue of the said Act of August 5, A. D. 1870, is hereby exempted and released from all State, county, town, city, municipal, and other taxes, for a period of twenty-five years from the 5th day of August, A. D. 1875, except county and municipal taxes in such counties, cities, and towns as have donated their bonds to aid in the construction of said railroad; but this exception shall not remain in force in favor of any county, city, or town which, having thus donated bonds, shall make default in the payment of either the interest or principal thereof; provided, that this exemption from taxation shall not be held or construed to include or apply to the lands or railroads which at the time of the consolidation hereinbefore recited belonged to the Houston & Great Northern Railroad Company, or which has since been or hereafter may be constructed or acquired under its charter; provided, nothing in this act contained shall be so construed as to exempt from taxation any lands to which the company may be entitled by virtue of the charter of the Great Northern Railroad Company, or the franchise, road bed, rolling stock, or any property acquired or hereafter to be acquired by virtue of the charter of the Great Northern Railroad Company.

"Sec. 7. That if a majority, in amount, of all the stockholders of the said The International & Great Northern Railroad Company shall in person or by proxy, at a meeting of the said stockholders held for that purpose, vote in favor of accepting the provisions of this act, and a certificate certifying that fact under the common seal of said company, attested by its secretary, shall be filed in the office of the Secretary of State within forty-five days after the approval of this act by the Governor of the State, this act shall thereupon be and become obligatory upon said company

and its successors, and, its provisions being complied with by the State, it shall be and constitute a full, final, and conclusive settlement of all the claims and demands of said company against the State for bonds under the ninth section of the said Act of August 5, A. D. 1870; and this act shall also be held to constitute an irrepealable contract and agreement between the State and the said company, its successors and assigns."

The information alleges that the "State of Texas by said last named special act granted to it (the railway company) and it now enjoys the said extraordinary exemptions, special privileges, immunities, and franchises from all State, county, city, town, municipal and other taxes on its said road bed, rolling stock, and other property, in and from its said eastern terminus at Longview, Gregg County, in and through the aforesaid intermediate counties, and all the towns and cities thereof, to its western terminus at Laredo, in Webb County, and still claims the right to continue to enjoy said exemption until August, 1900."

This contains a clear recognition of the fact that all the requirements of section 7 of the act had been complied with and that the exemption existed at the time the information was filed.

The grounds on which the forfeiture of the company's charter and its right to immunity from taxation were asked are thus summarized in brief filed for the State:

"1. That the respondent had willfully permitted its road bed and rolling stock to get out of repair, so as to endanger the lives of its passengers, and to delay and retard rather than to promote and facilitate travel; giving particulars.

"2. That it had failed to keep and maintain passenger and freight depots sufficient to accommodate the demands of the public, and that such as it did keep were low, flat, indecent buildings, totally unfit for railway purposes.

"3. That it had willfully diverted its corporate funds to other and different purposes, and was so encumbered by fictitious liabilities as to render itself unable to perform its public functions.

"4. That it failed to operate continuous and regular trains over its road from its eastern to its western termini as it had agreed to do.

"5. That it had abandoned the use of its road, over which it had never run any trains of its own for a number of years, from Taylor westward, a distance of several hundred miles, which part of the road was exclusively used by other and different railway companies.

"6. That it had leased and sold out its whole corporate property and franchises to a parallel and competing railway company and to a foreign corporation, in violation of its charter.

"7. That it had removed its general offices, domicile, and managing officers all out of this State into the city of New York, where they were maintained not by itself but by a foreign railway company.

"8.   That it was operating in and under the control of the Texas Traffic Association, a combination of competing railways, for the purpose and effect of preventing competition between itself and others.

"9.   That the officers of other competing railway companies controlled and managed the affairs of respondent exclusively.

"10.   That it was without a bona fide organization at all in the State of Texas."

Thus it is seen that the State bases its right to withdraw the immunity from taxation on no other ground than the failure of the company faithfully to exercise the powers conferred on it by its charter, in accordance with the laws of this State.

The court below held that the failure of the corporation in this respect was not such as to justify the forfeiture of its charter, but that it was such as required a judgment declaring that its property should not have the immunity from taxation given by the Act of March 10, 1875.

The first conclusion of the court below, for reasons before given, we can not revise; and if the immunity from taxation could be termed a corporate franchise, we do not see how it could be withdrawn until the term for which it was given expires, so long as the existence of the corporation continues, in the absence of something in the statute authorizing a partial forfeiture.

There is nothing in the statute which authorizes this partial forfeiture.

We can not now enter into an inquiry as to the inducement which may have led to the grant of the original charter to the International Railroad Company, nor into the validity of any claim appellant may have asserted against the State which led to the compromise act passed March 10, 1875.

All such questions were no doubt considered by the Legislature, and the rights of the parties settled by the act referred to and the acceptance of its provisions by appellant.

The validity of the exemption from taxation has been considered in former cases, and need not now be again discussed.   Railroad Company v. Anderson County, 59 Texas, 654; Railroad Company v. Smith County, 65 Texas, 21.

Looking to the provisions of the Act of March 10, 1875, we think there can be no doubt that the exemption from taxation given by it, instead of being a right vesting only in appellant, is a right which inheres in the property to which it applies, and follows it into the hands of whomsoever may become its owner.

The exemption is not given to a company named alone, but to its assigns and successors as well, thus evidencing an intention that the exemption from taxation should adhere to the property exempted, and follow it into the hands of whomsoever may become its owner.

No such state of facts is shown in the following cases, to which coun-

sel for the State refers and on which it relies: Morgan v. Louisiana, 93 U. S., 217; Railway v. Georgia, 98 U. S., 359; Railway v. Berry, 113 U. S., 465; Railway v. Miller, 114 U. S., 176; Pickard v. Railway, 9 Sup. Ct. Rep., 640.

These cases hold that exemption from taxation given to a named corporation will not inure to the benefit of another that may buy the property, or to a corporation formed from the consolidation of the one holding the exemption and another, in the absence of something showing an intention to fix the exemption on the property into the hands of whomsoever it may go.

These decisions, however, are fatal to the proposition that exemption from taxation in such cases is, within the meaning of the law, a corporate franchise, though it may be a franchise owned by a corporation.

The act in question and its acceptance by the company constitutes, as declared by the Legislature, "an irrepealable contract and agreement between the State and the said company, its successors and assigns," based on consideration deemed by the Legislature sufficient; and under it the right to the exemption would continue in favor of persons or corporporations who may become the owners of the property to which the exemption applies, even though the appellant corporation should be dissolved by a decree declaring the forfeiture of its charter.

The existence of this right enhances the value of the property to which it applies. Shareholders and creditors must be presumed to have dealt with the corporation on the faith of the contract which gave the exemption, and it can not be taken away by legislation, by dissolution of the corporation, or in any other manner not sufficient to pass title to any other property from one person to another.

The right to exemption from taxation is secured by the same guaranty which secures titles to those owning lands granted under the act, and though the corporation may be dissolved, will continue to exist in favor of persons owning the property to which the immunity applies.

Lawful dissolution of a corporation will destroy all its corporate franchises or privileges vested by the act of incorporation; but if it holds rights, privileges, or franchises having the nature of property, secured by contract based on valuable consideration, these will survive the dissolution of the corporation for the benefit of those who may have right to or just claim upon its assets.

The court below erred in adjudging a forfeiture of appellant's immunity from taxation, and in so far its judgment will be reversed and so much of the action as sought such relief will be dismissed, as ought to have been done by the court below on demurrer.

*Reversed and dismissed.*

Delivered December 10, 1889.